## Salyer et ux. v. Poulos et al.

Dec. 6, 1938.

T. E. MOORE, JR., for appellants.

JOHN B. EVERSOLE for appellees.

OPINION OF THE COURT BY JUDGE CAMMACK—Affirming.

Appellants, Dr. K. N. Salyer and his wife, Vera

Salyer, are the owners of a three-fourths undivided interest in a vacant lot in Hazard, Kentucky, located at the corner of Fleet and Main streets. Appellees, Anastasia and Dick Poulos, are the owners of the remaining one-fourth undivided interest in the lot. This suit was brought by appellants to have the property sold and the proceeds of the sale divided between the owners of the lot in proportion to their respective interests on the ground that the lot could not be divided without its value being impaired materially. Appellees filed an answer and cross-petition denying that the lot could not be divided without its value being materially impaired, and that the boundaries of the lot were as described in appellant's petition. Appellees' answer and cross-petition also set out the extent of the boundaries of the lot as claimed by them. During the time testimony was being given the court recessed, and certain measurements relating to the boundaries of the lot were made by a surveyor on the ground in the presence of the parties and their attorneys and the chancellor. Judgment was entered fixing the boundaries of the lot, and also decreeing that the property be divided in accordance with the interests of the parties, taking into account quantity, quality and value; to all of which appellants objected and excepted and prayed an appeal to this Court, which was granted and perfected.

The lot in question, formerly known as the D. Y. Combs lot, is located in the heart of the business section of Hazard. It fronts on Main Street, and is just south across Fleet Street from the court house. Appellants contend that the frontage of the lot on Main Street is not more than 42 feet, while appellees contend its frontage is 45 feet. The Combs lot was originally a part of a large lot fronting on Main Street known as the A. G. Duff lot, which extended along that street for a distance of somewhere between 80 and 100 feet. While there have been a number of deeds conveying parts and parcels of the Duff lot since a portion of it was conveyed to Combs in 1897, we see no reason to trace all of these transactions, in view of the fact that the only question at issue here, aside from the question of whether or not the lot now owned by appellants and appellees can be divided without materially impairing its value, is a question of fact as to the extent of the frontage of this lot on Main Street. The deed to Combs provided that the

southern boundary of his lot on Main Street should begin at a point 50 feet in a northerly direction along this street from the Northern Main street corner of the lot now known as the Cornett lot. While the record does not show that this point was definitely established as being on the dividing line between the original Duff lot and the Cornett lot, it seems from the various deeds relating to part of the Duff lot that this point has been accepted for many years as a point in the dividing line between the Cornett lot and the K. K. Davis lot. The Davis lot was originally the part of the Duff lot next to the Cornett lot.

The Combs lot, starting at the point 50 feet north of the corner of the Cornett lot, ran 32 feet along Main Street toward the court house. At the time the Combs deed was executed Fleet Street had not been improved, and the territory between the lot and the court house was a part of the public square. A few years after Combs acquired the lot, and before 1911, his building was destroyed by fire. When rebuilding, he extended his building in the direction of and onto the public square for a distance of some 10 feet. Later on, when Main Street and Fleet Street were improved by the city and sidewalks were laid, the extension on to the public square by Combs appears to have been recognized and his occupancy of the land in question was not molested. Furthermore, it appears that the property owners back of the Combs lot, up Fleet Street toward High Street, likewise took possession of and occupied parts of the public square to approximately the same extent as was done by Combs. Appellees insist that the Main Street frontage of the lot in question should be measured from the point representing the corner of Fleet and Main Streets south along Main Street for a distance of 45 feet. Appellants, on the other hand, insist that this frontage should be measured by beginning at a point on Main Street 50 feet north of the corner of the Davis and Cornett lots. By measuring in this manner, the lot in question would have a Main Street frontage of approximately 42 feet.

In 1911, the joint owners of the remainder of the Duff lot, which fronted on Fleet and Main Streets, divided the property. It appears that the parties intended to divide the property equally. The deed to the parties taking the lot now owned by Davis, and fronting on

Main Street, called for 23½ feet from the corner of the Cornett lot, while the deed to the parties taking the lot fronting on this street between the Davis lot and the Combs lot and now owned by Salyer called for 23½ feet, more or less. The deeds dividing the property fronting on Fleet Street referred generally to the rear boundary of the Combs lot, toward High Street, as extending 45 feet in a southerly direction from Fleet Street. Appellees urge that this reference to the rear boundary of the Combs lot indicates that the lot fronted 45 feet on Main Street at that time, 1911. In this connection, there is little or nothing of record to show that the front and back boundaries of the Combs lot were not of the same length.

Subsequently, deeds conveying the lot now owned by Salyer referred to its Main Street frontage as 25½ feet. It is not explained how this lot increased in size from 23½ feet in 1911 to 25½ feet in 1919, except that, as urged by appellants, the deed called for 23½ feet more or less frontage in 1911. But there is no satisfactory explanation of why the lot nearer the court house, and therefore probably of greater value, was made 2 feet wider than the other lot. If the southern boundary of the Combs lot was correctly established in the first place, and if there had been no encroachment on any of the remainder of the Duff lot by Combs, there should have been 50 feet of property in the Duff lot fronting on Main Street when it was divided in 1911. There is strong indication, however, that there remained only approximately 47 feet to be divided, as evidenced by the division deeds. There is some evidence that, when Combs was rebuilding his building after a fire, he moved it south several feet. On this point E. C. Wooton, a nephew of Combs who worked for him a while, and who was a part owner of the part of the Duff lot next to the Combs lot, at one time testified as follows:

"Q. 67. Was there ever any encroachment by D. Y. Combs upon that fifty foot from that time up until the time that you purchased your interest in the lot just south of the D. Y. Combs lot? A. Yes, there was, he let his roof extend out over the lot a little bit, he built his wall on the line and when he put the roof on of course the roof extended out on the lot a little, three or four inches or five, something like that.

"Q. 68. And was in that condition at the time you purchased this interest in the lot? A. Yes, I am sure it was.

"Q. 69. Was there any further encroachment on the fifty foot lot? A. Well, I don't know since that time what has been done there."

We see therefore, that there was some basis for uncertainty as to the boundary line between the Combs lot and the middle lot on Main Street taken by Wooton and his associates when the remainder of the Duff lot was divided in 1911; all of which could have accounted for the use of the phrase "more or less" in the deed describing the middle lot. The use of the phrase "more or less" in describing a boundary line relieves a stated distance of exactness, thereby meaning that the parties are to risk the quantity of land conveyed. The use of such a phrase also implies a waiver of the warranty as to a specified quantity. See Eastland v. Robinson, 233 Ky. 403, 25 S. W. (2d) 1028, 70 A. L. R. 365.

It appears that some time after 1911 a concrete fire wall was erected between the buildings on the Combs lot and on the lot now owned by Salyer. The evidence is conflicting as to whether this wall was placed on the line then recognized as being the boundary between the two lots, or whether it was placed on one or the other of the lots. According to the testimony of John Fitzpatrick, surveyor, a distance of 47 feet from the Cornett corner toward the wall would fall approximately a foot short of it, while a distance of 45 feet south from the corner of Fleet and Main Streets would go a little beyond the wall. According to the Fitzpatrick measurements the distance from the corner of Fleet and Main Streets to the concrete wall is approximately 44 feet. Fitzpatrick further testified that the frontage on Main Street of the Davis lot is approximately 24½ feet. It is to be recalled that the deed to this lot called for only 23½ feet on this street. There can be but little doubt that there has been an encroachment on the lot now owned by Salyer by the parties owning the Davis lot, if the Fitzpatrick measurements are correct.

After reviewing all of the evidence given in the case, and the history of the various deeds relating to parts and parcels of the original Duff lot, the chancellor, in a carefully prepared opinion, held that the Main

Street boundary of the lot now owned by appellees and appellants should be considered as extending from the intersection of Main and Fleet Streets to the concrete wall, thereby giving the lot a frontage of something between 44 and 45 feet on Main Street. If the distance is 44 feet from the corner of Fleet and Main Streets to the concrete wall, as from the evidence it appears to be, the middle lot owned by Salyer independently will have a Main Street frontage of approximately 23½ feet, even though the Davis lot has approximately a foot more frontage on Main Street, according to the testimony of Fitzpatrick, than was originally conveyed in the partition deed of 1911. In view of all the evidence and the circumstances in the case, and the fact that the chancellor was present when some of the measurements were made by Fitzpatrick, we are constrained to, and do, follow the judgment of the chancellor as to the extent of the Main Street boundary of the lot in question. Barbee v. Price, 263 Ky. 8, 91 S. W. (2d) 561; Blackburn's Adm'x v. Union Bank & Trust Co., 269 Ky. 699, 108 S. W. (2d) 806.

We are also of the opinion that the chancellor did not err in deciding that the lot could be divided without materially impairing its value. It is to be noted that appellants, owners of the three-fourths undivided interest in the lot, are contending that the division is not practicable, while appellees, owners of the one-fourth undivided interest, are insisting that the division be made. It is clear from the record also that appellees have indicated their willingness to take whatever part of the lot as may be awarded them. Even if the partition should be made in four equal parts fronting on Main Street, appellants would have a lot extending 33 feet on that street; assuming that the three parts awarded appellants were together. If such a division should be made, appellants' part of the lot would have a Main Street frontage greater than that of the nearby lots now owned by Salyer and Davis. While the evidence is conflicting as to whether or not the lot can be divided without an impairment of its value, we are disposed to, and do, follow the chancellor in this matter, especially in view of the fact that the owners of the one-fourth interest are the ones insisting that the division be made.

Judgment affirmed.